IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) MIKE LEE CASTANON, and <br> (2) ELITE OILFIELD SERVICES, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> (1) KELLY CATHEY, an individual; <br> (2) MIKE CORY, an individual; <br> (3) RICHARD BICKLE, an individual; <br> (4) DAVID MOORE, an individual; <br> (5) DEBBIE SCHAUF, an individual; and <br> (6) OKLAHOMA HORSE RACING COMMISSION, <br><br> Defendants. | Case No. CIV-18-537-R |

## ORDER

*EOS Trumpster,* a quarter horse owned by Plaintiffs Mike Lee Castanon and Elite Oilfield Services, LLC, galloped to victory at the Remington Park Racetrack in Oklahoma City on April 8, 2017. But after the win, *Trumpster*'s urine tested positive for trace amounts of Clenbuterol, a therapeutic medication barred for use on quarter horses. Citing this positive test, the Oklahoma Horse Racing Commission and the Remington Park race Stewards—together, the authorities overseeing and controlling horse racing—suspended the license of *Trumpster*'s trainer, Alfredo Gomez, on April 21, 2017. One collateral consequence of Gomez's suspension: another of Plaintiffs' horses, *EOS A Political Win*, was scratched from a race on April 22, 2017, even though the horse had no reported drug violations. Plaintiffs claim that the actions of the Commission and the Stewards—

especially the scratching of *A Political Win*—violated their rights. The movants (all Defendants, save Debbie Schauf) disagree, and they ask this Court to dismiss Plaintiffs' claims levied against them. Having considered the parties' filings, *see* Docs. 7, 9–10, the Court dismisses Plaintiffs' federal claims, declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and remands the remainder of the case to the District Court of Oklahoma County.

I.  **Background**

The Court takes as true all well-pleaded factual allegations in the complaint, views them in the light most favorable to Plaintiffs, and draws from them all reasonable inferences in Plaintiffs' favor. *See Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). This case deals with horse racing in Oklahoma, so the Court will offer some legal context before it recites the facts. Oklahoma horse racing is governed by the Oklahoma Horse Racing Act ("Act"), 3A O.S. § 200 *et seq.*, and attendant regulations.[1] The Act creates horse racing's governing body, the Oklahoma Horse Racing Commission ("Commission"), *see* 3A O.S. § 201, which enjoys "plenary power to promulgate rules and regulations for the forceful control of race meetings" in Oklahoma. *Id.* § 203.7; Okla. Admin. Code. § 325:1-1-3. These powers may also be delegated to Stewards, who directly oversee races. *See* 3A O.S. §§ 203.4, 204(B)(1); *see also* Okla. Admin. Code § 325:20-1-3. The Commission and Stewards, in exercising their broad powers, "may suspend or revoke any occupation license" for violations of statutory or

---

[1] The Court cites to the 2016 editions of Oklahoma's Statutes and Administrative Code.

regulatory provisions, or "[a]ny other just cause as determined by the Commission." 3A O.S. § 204.2(D); *see also id*. § 204.3(B) (granting the Commission or the Stewards authority to "summarily suspend an occupation license" at a race "pending further proceedings").[2] And, regarding medication of race horses, the Act prohibits "administration of any drug or medication to a horse prior to or during a horse race" unless permitted by rule. *Id*. § 208.11(C).

Regulations further explicate the Stewards' powers. "The Stewards have general authority and supervision over all licensees," "the power to interpret the rules and to decide all questions not specifically covered by these rules," and "the power to determine all questions arising with reference to entries, eligibility and racing." Okla. Admin. Code § 325:20-1-8. "The Stewards may . . . suspend . . . the occupation license of any person whom they have the authority to supervise," and they may also suspend a horse from participating in races if the horse is involved with "[a]ny violation of medication laws and rules" or "[a]ny suspension . . . of an occupation license . . . ." *Id*. § 325:1-1-7(a), (c)(2); *see also id*. § 325:15-5-10(a) (noting Stewards may suspend license for violations of "any provision of the Oklahoma Horse Racing Act or of the Rules and Regulations of the Commission," or for "any other valid ground or reason"). Specifically, Stewards may suspend trainers when the urine sample from a horse under their supervision tests positive for banned drugs or medications. *See id*. § 325:35-1-5(a) ("Should the chemical analysis,

---

[2] Included within the Commission's sweeping jurisdiction is the authority to control licensing, suspensions, drug testing, and exclusions from races. *See* 3A O.S. §§ 204(A), 204.2. Horse owners, trainers, and jockeys must obtain licenses from the Commission to participate in racing. *See id*. § 204.2(A)

3

*urine or otherwise*, taken from a horse under his/her supervision show the presence of any drug or medication . . . it shall be taken as prima facie evidence that the same was administered by or with the knowledge of the Trainer . . . . At the discretion of the Stewards . . . the Trainer . . . may be . . . suspended . . . ." (emphasis added)); *id*. § 325:45-1-6(j) ("It shall be prima facie evidence that a horse had been administered and carried a drug [or] medication . . . prohibited by this Section while running a race if . . . a . . . urine . . . sample or specimen from the horse was taken . . . and . . . the Primary Laboratory detected a drug [or] medication . . . prohibited by or in excess of Commission-Sanctioned Threshold levels established by Commission Directive [3A:205.2(H)]. . . . The Affidavit submitted by the Primary Laboratory shall be supported by urine and/or plasma/serum results."); *see also id.* §§ 325:45-1-4, 325:45-1-5.

Where a trainer is suspended or otherwise unavailable after a horse has been entered in a race, it falls within the Stewards' discretion whether to replace the trainer. *See id*. § 325:20-1-11(b) ("In the absence of the Trainer of the horse, the Stewards may place the horse in the temporary care of another Trainer of their selection . . . ."); *id*. § 325:25-1-3 ("All entries . . . are under the supervision of the Stewards . . . and they, without notice, may refuse . . . the transfer of entries."); *see also id*. § 325:35-1-5 (designation of alternative trainer "shall be made prior to time of entry, unless otherwise approved by the Stewards"). Critically, a horse may not race unless it is under the care of a trainer in good standing. *See id*. § 325:25-1-10 ("[A] horse is ineligible to start in any race if . . . the horse is in the care of an unlicensed Trainer."). "Any horse . . . ineligible to start in any race which is entered . . . may be scratched . . . ." *Id*. § 325:25-1-12.

4

The suit's events take place within this context. Plaintiffs are owners of two racing quarter horses, *EOS Trumpster* ("Trumpster") and *EOS A Political Win* ("A Political Win"). Doc. 1-1, at 7. The moving Defendants are (1) the Oklahoma Horse Racing Commission; (2) Kelly Cathey, the executive director of the Commission; (3) Mike Cory, the *de facto* Chief Steward at Remington Park Racetrack; (4) Richard Bickle, a race Steward; and (5) David Moore, a race Steward. *See* Doc. 1-1, at 2–3.³ Plaintiffs entered Trumpster and A Political Win in races at the Remington Park Racetrack in Oklahoma City, Oklahoma, in April 2017, retaining Alfredo Gomez, a Commission-licensed trainer and jockey, to care for and ride the horses. *Id*. On April 8, 2017, Gomez, riding Trumpster, won the seventh race at Remington Park; following the win, Trumpster submitted to post-race blood and urine testing. *Id*. Trumpster's testing samples were analyzed by the Industrial Laboratories Company, under contract with the Commission, on April 11, 2017. *Id*.⁴ A final report was issued on April 20, 2017, which indicated that Trumpster's urine sample contained a trace positive of Clenbuterol, "a federally approved therapeutic

---

³ Debbie Schauf, executive director of the Oklahoma Quarter Horse Race Association, is also a defendant in this matter. *See* Doc. 1-1, at 3. However, Defendant Schauf has neither filed her own motion to dismiss nor joined in the instant motion.

⁴ Plaintiffs allege that Mike Cory "communicated with personnel at the Industrial Laboratories regarding the testing done on *EOS Trumpster* before any final report was prepared or sent." Doc. 1-1, at 7. As a result, Cory "knew what the Industrial Lab Report would reflect days before a written report was sent." *Id*. These allegations are somewhat tangential, though Plaintiffs seem to include them in their complaint to (1) bolster their assertion that the Stewards unreasonably delayed notifying Plaintiffs of Trumpster's positive test result, *see id*. at 7–10, and to (2) embellish their contention that the Stewards' actions were motivated by improper bias. *See id*. at 9 ("The Stewards had an ulterior and clearly improper motive in summarily suspending an Hispanic trainer, which was further intentionally compounded by the exclusion of Castanon's horse *EOS A Political Win* from the futurity . . . ."). As to this latter contention, if Plaintiffs are attempting to make out a conspiracy or discrimination claim, their allegations are impermissibly conclusory and undernourished. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that Rule 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," "labels and conclusions," and "naked assertions devoid of further factual enhancement" (brackets, internal quotation marks, and citations omitted)).

5

medication . . . . widely utilized . . . for active horses." *Id*. at 7–8. But under Oklahoma law, Clenbuterol use is banned in quarter horses, such as Trumpster.[5] Following the final report, the Commission, through Defendant Cory, "telephonically pronounced a summary suspension" of Gomez. *Id*. at 8. Gomez's occupation license was formally suspended by the Commission the next day—April 21, 2017—which caused all horses entered by Gomez to be scratched from upcoming races. *Id*. One of the scratched horses, A Political Win, had no reported positive drug tests, and was the "5/2 morning line favorite to win the Remington Park Futurity . . . scheduled . . . on April 22, 2017." *Id*. at 9.[6] Plaintiffs made an emergency request for a stay of the Stewards' ruling, but the Commission's executive director, Defendant Cathey, denied the request. Moreover, the Commission and the Stewards refused Plaintiffs' request to transfer A Political Win to another trainer so that the horse could race. *Id*.

Plaintiffs assert procedural and substantive due process claims under 42 U.S.C. § 1983 against Defendants Cathey, Cory, Bickle, and Moore, and a negligence claim under the

---

[5] Under the Act, the Commission is "authorized to determine by rule which drugs and medications, if any, may be administered to a horse prior to or during a horse race . . . ." 3A O.S. § 208.11(A). Unless permitted by rule, the administration of any drug or medication to a horse before or during a race is prohibited. *Id*. § 208.11(C). The Commission, in its discretion, may suspend the license of any party that violates the Act or promulgated rules and regulations. Okla. Admin. Code § 325:1-1-6; *see also id*. §§ 325:1-1-7(a); 325:45-1-4 ("Except as authorized . . . no drug or medication shall be administered to any horse within 24 hours of a race in which a horse is entered. Presence of any drug . . . or . . . any substance foreign to the natural horse . . . may result in disqualification by the Stewards."). The Directive on Commission-Sanctioned Thresholds [3A: 205.2(H)], which features prominently in the parties' briefing, states that, "[a]s of March 1, 2015, . . . Clenbuterol will now be regarded as [a] prohibited drug[] in Quarter Horses . . . ." *See* Doc. 9-2, at 2. While Plaintiffs doubt that Clenbuterol affects horse performance, *see* Doc. 1-1, at 8–9, their primary contention is that Clenbuterol's presence may not be ascertained through an equine urine sample. *See generally* Docs. 1-1, 9; *see also infra* note 9.

[6] The Remington Park Futurity's "purse" was over one million dollars. Doc. 1-1, at 9.

Oklahoma Governmental Tort Claims Act against the Commission. *See* Doc. 1-1, at 10–16; *see also* Doc. 7.[7] Defendants move to dismiss these claims.

## II. Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). While a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests," *Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012) (ellipsis, internal quotation marks, and citations omitted), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). When assessing a complaint's sufficiency, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which

---

[7] Defendants Cathey, Cory, Bickle, and Moore are sued in their individual capacities and are alleged to have been acting under color of state law during the events of this case. Doc. 1-1, at 2–3.

7

a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004 and Supp. 2007)).

### III. Discussion

Plaintiffs assert federal claims against Defendants Cathey, Cory, Bickle, and Moore—the individual Defendants—and state law claims against the Commission. *See generally* Doc. 1-1. The individual Defendants raise the defense of qualified immunity, which shields public officials sued in their individual capacities "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). When this defense is raised, officials enjoy a presumption of immunity—as such immunity is "the norm in private actions against public officials." *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) (internal quotation marks and citations omitted); *see also Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) ("[Q]ualified immunity protects all officials except those who are plainly incompetent or those who knowingly violate the law." (internal quotation marks and citation omitted)); *Lewis v. Tripp*, 604 F.3d 1221, 1230 (10th Cir. 2010) ("If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."). "A plaintiff can overcome this presumption of immunity only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his [statutory or] constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity . . . ." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) (citations omitted). The Court, in its discretion, may

decide which prong of the qualified immunity analysis it will address first, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), but addressing "the first qualified immunity [prong] before proceeding to the second . . . . should be the exception, not the rule," as constitutional avoidance considerations generally counsel in favor of "proceed[ing] directly to, . . . address[ing] only, and . . . deny[ing] relief exclusively based on" whether a right was clearly established. *Kerns*, 663 F.3d at 1181; *see also Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. . . . And indeed, our usual adjudicatory rules suggest that a court *should* forbear resolving this issue." (emphasis original)).

A right is clearly established when a reasonable official would have understood that what he or she was doing violated that right. *See Estate of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir. 2016). Plaintiffs must identify clearly established law that would have notified Defendants that their actions were unlawful. *See Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1202 n.3 (10th Cir. 2017). Plaintiffs may show the law to be "clearly established" by citing an on-point Supreme Court or Tenth Circuit decision; alternatively, "the clearly established weight of authority from other courts must have found the law to be as . . . [P]laintiff[s] maintain[]." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) (internal quotation marks and citation omitted). An "on-point decision" means that the precedent is "particularized to the facts"—that it "involves materially similar facts" to the case at hand. *Apodaca*, 864 F.3d at 1076 (10th Cir. 2017); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is whether

the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (emphasis, internal quotation marks, and citations omitted)). In other words, on-point precedent cannot define a right at "a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); otherwise, "Plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (ellipsis original) (alterations, brackets, internal quotation marks, and citation omitted). Rather, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted).[8]

(A) <u>Procedural Due Process</u>

Plaintiffs first claim that the individual Defendants deprived them of due process when infringing on their protected interests. Doc. 1-1, at 10–12. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Thus, "[t]o assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if

---

[8] In light of the significant impediment they pose to plaintiffs, "qualified immunity questions should be resolved at the earliest possible stage of a litigation," so as "to protect public officials from the broad-ranging discovery that can be peculiarly disruptive of effective government." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (internal quotation marks and citation omitted). Thus, while typical motion-to-dismiss standards still apply even when defendants invoke qualified immunity, these standards "may have greater bite" in light of the "special interest" in resolving qualified immunity issues quickly and efficiently. *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

so, then (2) was the individual afforded an appropriate level of process." *Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1078 (10th Cir. 2011) (internal quotation marks and citation omitted).

"Liberty interests can either arise from the Constitution or be created by state law." *Cordova v. City of Albuquerque*, 816 F.3d 645, 656–57 (10th Cir. 2016). "For state law to create a liberty interest, it must establish substantive predicates to govern official decisionmaking and mandate an outcome when relevant criteria have been met." *Elwell v. Byers*, 699 F.3d 1208, 1214 (10th Cir. 2012). "If state law establishes a substantive predicate without mandating an outcome, the law creates nothing more than a right to process which is not a constitutionally cognizable liberty interest." *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1200 (10th Cir. 2010); *see also Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) ("If the decisionmaker is not required to base its decisions on objective and defined criteria, but instead can deny the requested relief for any constitutionally permissible reason or for no reason at all, the State has not created a constitutionally protected liberty interest." (internal quotation marks and citations omitted)); *Elwell*, 699 F.3d at 1214 ("[W]hen state law creates a mandatory procedure but does not guarantee a particular substantive outcome, it does not confer a protected liberty interest.").

Property interests, on the other hand, "are not created by the Constitution," but rather "are created and . . . defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577; *see also Milcor I, LLC v. Luers*, 764 F. App'x 747, 753 (10th Cir. 2019) ("In order to create a

property interest, the state statute or regulation must give the recipient a legitimate claim of entitlement to the benefit allegedly deprived." (internal quotation marks, citations, and brackets omitted)). To have a property interest in a benefit, then,

> a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

*Roth*, 408 U.S. at 577; *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"). "Detailed procedures in a state statute or regulation," however, "are not, by themselves, sufficient to create a property interest." *Greene v. Barrett*, 174 F.3d 1136, 1140 (10th Cir. 1999).

The parties spend page after page jockeying over the intricacies of Oklahoma's regulatory landscape. Plaintiffs in particular are keen on litigating the Stewards' decision to suspend Gomez's license after Trumpster's positive urine test.[9] The Court need not and

---

[9] Indeed, the parties dedicate substantial portions of their briefs to whether the Stewards' decision to suspend Gomez's license was based on an improper urinalysis and, therefore, arbitrary. *See* Doc. 7, at 11–15, 19–21; Doc. 9, at 8–12, 15–16. Plaintiffs rest their argument on a Commission-issued Directive dealing with permissible drug and medication procedures for race horses. *See* Doc. 9-2. As Plaintiffs read this Directive, the Stewards or Commission may not suspend a trainer's license for a drug-related infraction unless that infraction is based on an equine plasma/serum sample—*not* a urine sample. *See* Doc. 9 at 9-11. Thus, because Gomez's suspension was predicated on a positive drug test from Trumpster's *urine* sample, not blood or plasma, the suspension contravened applicable statutes and regulations. Doc. 1-1, at 7–9. In support, Plaintiffs cite an unpublished order from June 1, 2017, issued by the District Court of Oklahoma County in *Willis v. Oklahoma Horse Racing Commission*, No. CJ-2017-2810, in which the district judge held that the Directive limited positive drug tests to blood samples. *See* Doc. 9-1, at 8–9.

To start, Plaintiffs' outsized reliance on the Directive is curious, given their assertion that it is *ultra vires*. *See* Doc. 1-1, at 6 n.1 ("The OHRC failed to comply with fundamental rulemaking procedures for development of this directive. If followed, that process would have required a public notice, comment period and room for judicial review for any final rule promulgated."). As to *Willis*, unpublished district court orders are without precedential or persuasive value; thus, neither Plaintiffs nor this Court may rely upon them. *See* Okla. Sup. Ct. R. 1.200(c)(5) ("Because unpublished opinions are deemed to be without

will not arbitrate these collateral fights, choosing instead to heed the Supreme Court's admonition to "think hard, and then think hard again, before turning small cases into large ones." *Camreta*, 563 U.S. at 707. Faced with the individual Defendants' invocation of qualified immunity, Plaintiffs must point to a clearly established right that Defendants violated. *See Milcor I*, 764 F. App'x at 752. Plaintiffs nominate five "candidates" for constitutionally protected liberty or property interests: (1) a right to take part in a horse race (or, more specifically, the right to participate in a race where the horse is already entered and has no drug violations); (2) a right to notice of impending adverse action and a meaningful opportunity to be heard; (3) a right to switch trainers to allow an eligible

---

value as precedent and are not uniformly available to all parties, opinions so marked shall not be considered as precedent by any court or cited in any brief or other material presented to any court . . . ."); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of the Cty. of Rogers*, 27 F.3d 1499, 1513 (10th Cir. 1994) ("Because under Oklahoma law neither the district court nor our court may rely upon . . . an unpublished opinion, we must disregard that authority."); *Burns v. Cline*, 2016 OK 121, ¶ 3 n.4, 387 P.3d 348, 351 (finding that the parties' citation to unpublished district court judgments violated Oklahoma Supreme Court Rule 1.200(c)).

More significantly, Plaintiffs' argument, at bottom, amounts to a collateral challenge to the Stewards' suspension of Gomez's license. Gomez had his license suspended because of Trumpster's positive test result for Clenbuterol. *Id*. at 8; *see also* Okla. Admin. Code § 325:35-1-5(a). Plaintiffs contend this suspension was improper because applicable regulations deemed urinalysis inadequate to establish the presence of Clenbuterol. Gomez is not a party to this suit, and "plaintiff[s] generally must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). If Plaintiffs intend to challenge the suspension of Gomez's license, then they have failed to make a showing sufficient to justify third-party standing. *See Lane v. Simon*, 495 F.3d 1182, 1187 (10th Cir. 2007) ("Third-party standing requires not only an injury in fact and a close relation to the third party, but also a hindrance or inability of the third party to pursue his or her own claims." (internal quotation marks and citations omitted)); *see also The Wilderness Soc'y v. Kane County*, 632 F.3d 1162, 1168 (10th Cir. 2011) ("The prudential standing doctrine encompasses various limitations, including the general prohibition on a litigant's raising another person's legal rights." (brackets, internal quotation marks, and citations omitted)). Neither have Plaintiffs shown that they themselves had a property interest in Gomez's license. As well, Plaintiffs have indicated no liberty or property rights violation vis-à-vis Trumpster; nowhere in the complaint do Plaintiffs allege that their licenses as owners were suspended, or that Trumpster was forced to forfeit the prize money he won in his race. Trumpster's urine sample, then, bears on this case only insofar as it set off a chain of events leading to A Political Win's scratch. Oklahoma's taxonomy of equine bodily fluids, though thoroughly expounded upon in the briefing, is at most marginally related to the bedrock questions animating Plaintiffs' due process claims and Defendants' qualified immunity defenses.

13

horse to compete; (4) a right not to have a horse scratched from a race based on another horse's positive drug test; and (5) a right to pre-deprivation judicial review. *See* Doc. 9, at 13–16.

First, several of these "rights candidates" do not qualify as constitutionally protected interests at all, regardless of whether they are classed as "liberty interests" or "property interests."[10] Neither are any of Plaintiffs' purported rights "liberty interests" to which due process protections apply. Plaintiffs' liberty interest argument turns entirely on the limitations Oklahoma has placed on official decision-making: because race Stewards do not enjoy unbridled discretion, say Plaintiffs, Oklahoma has created liberty interests. *See* Doc. 9, at 14–16. But in support of this argument Plaintiffs cite only the procedural limitations imposed on agencies by Oklahoma's Administrative Procedures Act, 75 O.S. §

---

[10] For example, a "right to process," on its own, is not a constitutionally protected liberty or property interest:

> What constitutes a liberty or property interest within the meaning of the Fourteenth Amendment is not always easy to determine. . . . Liberty and property are broad and majestic terms that relate to the whole domain of social and economic fact. But they are not unlimited in scope. In particular, the protected interests are substantive rights, not rights to procedure. As the Supreme Court wrote in *Olim v. Wakinekona,* 461 U.S. 238 (1983), "[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." *Id.* at 250 n. 12. "Process is not an end in itself," it explained. *Id.* at 250. "Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Id.* Thus, an entitlement to nothing but procedure cannot be the basis for a liberty or property interest.

*Elliott v. Martinez*, 675 F.3d 1241, 1245 (10th Cir. 2012) (additional brackets, ellipsis, internal quotation marks, and citations omitted); *see also Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003) ("It is well established that the mere existence of an entitlement to a hearing under state law, without further substantive limitation, does not give rise to an independent substantive property interest protected by the [F]ourteenth [A]mendment." (brackets, internal quotation marks, and citation omitted)); *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1570 (10th Cir. 1993) ("The mere expectation of receiving a state afforded process does not itself create an independent liberty interest protected by the Due Process Clause."). Thus, Plaintiffs' rather tautological assertion that they were entitled to due process before their due process rights were violated, *see* Doc. 9, at 13–14, 16, is unavailing.

250 *et seq.*, and broad judicial admonitions against arbitrary and capricious agency action. *See id.* (citing 75 O.S. § 322 and *State ex rel. Bd. of Trs. of Teachers' Retirement Sys. v. Garrett*, 1993 OK CIV APP 29, 848 P.2d 1182). As stated, an expectation of receiving process, without more, does not give rise to a liberty interest. *See supra* note 10. And Plaintiffs point to no objective, substantive standards mandating particular outcomes—a necessary predicate for liberty interests where official discretion is at issue. Thus, Plaintiffs fail to show that any of their purported rights qualify as liberty interests protected by the Fourteenth Amendment.

Plaintiffs, likewise, fail to show that their purported rights qualify as constitutionally protected property interests. Plaintiffs offer no cases recognizing their rights candidates as property interests, and what legal language Plaintiffs do cite is of the highly generalized variety the Supreme Court ranks as unhelpful in the qualified immunity context. What's more, analogous cases the Court has located—scant as they are—indicate that Plaintiffs' proposed rights, such as a lost opportunity to compete for prize money, are not constitutionally protected property interests. *Cf., e.g., Torrez v. Julian*, No. CIV 01-720 BB/LCS, 2002 WL 35649717, at *8 (D.N.M. Aug. 8, 2002) (recognizing that "loss of opportunity for a possible promotion in the future is not a protected property interest"). Thus, as Plaintiffs have not demonstrated they had legitimate claims of entitlement to any of the purported benefits or opportunities they were allegedly denied, no property interests are at issue here.

But regardless of whether Plaintiffs' allegations amount to liberty or property interests, the individual Defendants are shielded by qualified immunity because Plaintiffs

have not shown that any of their alleged protectable interests were clearly established at the time of the events in question. Crucially, Plaintiffs' cited cases offer little more than sweeping generalities; factually dissimilar circumstances; or unpublished, non-precedential dispositions from state trial courts.[11] Such legal authority is insufficient to overcome the high hurdle of qualified immunity's second prong.

In sum, the crucial element missing from Plaintiffs' narrative is a constitutionally protected interest—or, more to the point, a protected interest that was clearly established when these events transpired. Nowhere do Plaintiffs allege that the individual Defendants suspended their licenses, barred them from the racetrack, or ordered them to forfeit Trumpster's prize money. Plaintiffs cite no cases recognizing a constitutionally protected

---

[11] First, Plaintiffs rely on passages from Supreme Court decisions outlining the broad contours of Due Process analysis. *See* Doc. 9, at 13–16, 26–29 (citing, among other cases, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972), and *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Given "the Supreme Court's repeated admonition not to define clearly established law at a high level of generality, *Cox v. Glanz*, 800 F.3d 1231, 1245 n.6 (10th Cir. 2015) (brackets, internal quotation marks, and citation omitted), Plaintiffs' reliance on general propositions of law fails to show that the individual Defendants' conduct in these particular circumstances violated any of Plaintiffs' liberty or property interests. *See al-Kidd*, 563 U.S. at 742 ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."); *Cox*, 800 F.3d at 1247 n. 8 ("[Plaintiff] cannot discharge her burden [to show that the law was clearly established] by relying upon authorities that do no more than establish general legal principles—even if those principles are apposite . . . ."). Second, Plaintiffs' reliance on cases dealing generally with horse racing, *see* Doc. 9, at 28, is misplaced, as these cases are not only factually distinguishable from the case at bar, but also lack precedential value and fail to show that the weight of authority has clearly established the rights Plaintiffs allege were violated. *See Porter v. DiBlasio*, 93 F.3d 301, 305–07 (7th Cir. 1996) (considering what process was due before state could permanently deprive owner of property interest in horses); *Gulotta v. New Jersey Racing Comm'n*, A-1774-12T3, 2014 WL 4375668, at *9–10 (N.J. Super. Ct. App. Div. Sept. 5, 2014) (grappling with granting reciprocity to out-of-state ruling barring owner's horse from racing and ordering forfeiture of prize money); *Goldstein v. State Horse Racing Comm'n*, 557 A.2d 1183, 1185 (Pa. Commw. Ct. 1989) (recognizing due process violation when commission ordered owner to return prize money without notice and a hearing). Finally, Plaintiffs cite an Oklahoma state district court case to show that the impropriety of the Stewards' actions was clearly established at the time of the events in question. *See* Doc. 9, at 28–29 (citing April 17, 2017, order issued by the District Court of Oklahoma County in *McLean v. Oklahoma Horse Racing Commission*, CJ-2017-2206, attached as Exhibit 3 to Plaintiffs' response). Plaintiffs may not rely on unpublished district court orders, and the Court will not consider them. *See supra* note 9.

interest in A Political Win's race slot, or in transferring a horse already entered in a race from one trainer to another, or in any of the other procedures, benefits, or opportunities on which Plaintiffs hope to rely. Neither can Plaintiffs anchor their procedural due process claim to their collateral challenge of Gomez's suspension and the urinalysis from which this case's facts flow. Thus, to the dispositive question in qualified immunity cases—was the violative nature of particular conduct clearly established?—the answer, here, is no. *See Mullinex*, 136 S. Ct. at 308. This answer entitles the individual Defendants to qualified immunity. Plaintiffs' § 1983 procedural due process claims are, therefore, dismissed.

(B)     Substantive Due Process

Plaintiffs also claim that the individual Defendants violated their substantive due process rights. As the Tenth Circuit recently explained,

> the Supreme Court recognizes two types of substantive due process claims: (1) claims that the government has infringed a fundamental right; and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience. We apply the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action. . . . Executive action that shocks the conscience requires much more than negligence. Even the actions of a reckless official or one bent on injuring a person do not necessarily shock the conscience. Conduct that shocks the judicial conscience is deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice. To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression. The behavior complained of must be egregious and outrageous.

*Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (internal quotation marks, paragraphs, and citations omitted), *cert. denied sub nom. I.B. v. Woodard*, No. 18-1173, 2019 WL 1116409 (U.S. May 20, 2019); *see also Lindsey v. Hyler*, 918 F.3d 1109, 1116

17

(10th Cir. 2019) ("This [arbitrary or conscience-shocking standard] is exacting. Only the most egregious official conduct can be said to be arbitrary in the constitutional sense. . . . Challenged actions must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience-shocking." (internal quotation marks, citations, paragraphs, and brackets omitted)).

Plaintiffs specify that "[t]his case implicates the arbitrary governmental action prong of substantive due process." Doc. 9, at 21. The individual Defendants again invoke qualified immunity, thereby foisting upon Plaintiffs the two-part burden of showing that Defendants' actions "violated a . . . constitutional or statutory right" and, if they did, "that the right was clearly established at the time" of Defendant's conduct. *Leiser v. Moore*, 903 F.3d 1137, 1139 (10th Cir. 2018) (internal quotation marks and citation omitted). As with their procedural due process claims, Plaintiffs fail to carry this burden. Plaintiffs offer no support for their theory that they were deprived of liberty or property rights, which alone is fatal to their claims. Moreover, none of Plaintiffs' allegations, in isolation or in the aggregate, come close to the "egregious and outrageous" governmental conduct necessary for a substantive due process claim.[12] And beyond their allegations, Plaintiffs offer no cases clearly establishing that the individual Defendants' conduct and decision-making violated Plaintiffs' rights in a conscience-shocking manner. Therefore, "[b]ecause [Plaintiffs] have

---

[12] That Plaintiffs fall short of this "egregious and outrageous" bar is clear simply by juxtaposing the events here against cases involving outrageous and conscience-shocking conduct. *See Rochin v. California*, 342 U.S. 165, 172 (1952) (judicial conscience shocked where sheriff forced an individual to vomit by pumping his stomach); *T.D. v. Patton*, 868 F.3d 1209, 1213 (10th Cir. 2017) (judicial conscience shocked where a social worker's actions led to a minor being physically and sexually abused); *see also Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing *Rochin* and *Patton* as illustrating outrageous and conscience-shocking behavior).

failed to demonstrate that [the individual Defendants] violated a constitutional right—let alone a constitutional right that was 'clearly established' at the time of these events," *Lindsey*, 918 F.3d at 1116—these Defendants are entitled to qualified immunity, and Plaintiffs' § 1983 substantive due process claims are dismissed.[13]

(C) <u>Remaining State-Law Claims</u>

The only claims remaining after dismissal of Plaintiffs' § 1983 claims are a tortious interference with prospective economic relations claim against Defendant Debbie Schauf, who is not a movant, and a negligence claim against the Commission.[14] This court "may decline to exercise supplemental jurisdiction" over a state-law claim when it "has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). The court's "decision whether to exercise that jurisdiction . . . is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (internal quotation marks and citation omitted); *see also Carnegie-Mellon Univ. v.*

---

[13] In Count 3 of their complaint, Plaintiffs also seek declaratory and injunctive relief against Defendants Cathey, Cory, Bickle, and Moore based on their § 1983 claims. *See* Doc. 1-1, at 13–14. Because the Court has dismissed the substantive § 1983 claims, any associated request for injunctive or declaratory relief is accordingly denied. *See Hubbard v. Oklahoma ex re. Okla. Dep't of Human Servs.*, 759 F. App'x 693, 715 n.15 (10th Cir. 2018). Plaintiffs also seek declaratory and injunctive relief against the Commission. But, as explained above, Plaintiffs' § 1983 allegations are fatally deficient—Plaintiffs did not sufficiently allege a constitutionally protected liberty or property interest, and they allege no conduct shocking to the judicial conscience. *See supra* Section III(A)–(B). Thus, as with the individual Defendants, Plaintiffs' allegations are unable to support a request for injunctive and declaratory relief against the Commission.

[14] Plaintiffs plead a request for punitive damages as a "claim" against all Defendants, but "[i]n Oklahoma, punitive damages are generally considered to be an element of recovery of the underlying cause of action; a request for punitive damages is not a separate cause of action." *See Greene v. Brothers Steel Erectors, LLC*, CIV-18-484-R, 2019 WL 1848557, at *1 (W.D. Okla. April 24, 2019)

*Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of [discretionary] factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Cantwell v. De La Garza*, No. CIV-18-272-D, 2019 WL 2166541, at *4 (W.D. Okla. May 17, 2019) ("Tenth Circuit law is clear that if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by . . ., in a removed case, remanding the case to state court." (internal quotation marks and citations omitted)). In their joint notice of removal, Defendants contend that this Court has original federal question jurisdiction over Plaintiffs' § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. *See* Doc. 1, at 2. Accordingly, having dismissed Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and remands the case to the District Court of Oklahoma County.

**IV. <u>Conclusion</u>**

For the reasons stated above, the Court DISMISSES Plaintiffs' § 1983 claims and REMANDS the case to the District Court of Oklahoma County.

IT IS SO ORDERED this 11th day of July, 2019.

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE